Argued and submitted January 31, reversed and remanded June 24, 1992

In the Matter of the Petition of

BROADWAY DELUXE CAB COMPANY,
aka Broadway Enterprises, Inc.,
dba Broadway Cab Cooperative
and dba Broadway Cooperative, Inc.,
*Petitioner,*

*v.*

The filings of the
NATIONAL COUNCIL ON
COMPENSATION INSURANCE,
*Respondent below,*

*and*

SAIF CORPORATION,
*Respondent.*

(89-09-26; CA A68146)

833 P2d 1303

William F. Hoelscher, Portland, argued the cause for petitioner. With him on the brief was Hoelscher & Associates, Portland.

David L. Runner, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Before Warren, Presiding Judge, and Riggs and Edmonds, Judges.

WARREN, P. J.

## WARREN, P. J.

Broadway Deluxe Cab Company (Broadway) petitions for review of a Department of Insurance and Finance (DIF) order directing it to pay SAIF, its workers' compensation carrier, premiums for its "shift lease" taxi drivers. We reverse and remand.

There are no material factual disputes. Broadway owns taxi permits issued by the City of Portland. Each permit allows Broadway to operate one taxi, 24 hours a day. Because Broadway owns no taxis, it sells the right to use its taxi permits to taxi owners,[1] who pay a fixed weekly fee to Broadway for its administrative and dispatching services. The owner-operators are liable for that fee, even if their fares are insufficient to cover it, but Broadway is not entitled to any specific portion of an operator's fares. The weekly fees are Broadway's only source of revenue.

Because payment of the weekly fee authorizes an owner to operate a taxi 24 hours a day, 7 days a week, it is calculated on the assumption that each taxi will be so used. Accordingly, owners who want to maximize their investment arrange to lease their taxis to other drivers to operate when they cannot. Those "shift lease" drivers are also entitled to keep their fares but are responsible for a *pro rata* portion of the owners' weekly fees.[2]

---

[1] Broadway issues two shares of stock for each permit and sells those shares to the owner or owners of a single taxi.

[2] DIF made these findings about the relationship between Broadway, the taxi owners and the shift lease drivers:

"A driver's *normal shift is 12 hours a day.* An owner-operator may choose to operate their cab each day for a 12-hour shift, and to lease their cab each day for a 12-hour shift.

"* * * * *

"If the owner-operator chooses to lease their cab, [Broadway's] vehicle superintendent maintains a list of drivers who have met [Broadway's] shift lease driver qualifications. The superintendent assigns a shift lease driver to an available cab and the shift lease driver may be assigned a different cab each shift they drive.

"Before [Broadway] allows the potential shift lease driver to lease a cab, the driver must meet [Broadway's] driver qualifications:

"1. attend [Broadway's] driver training program;

"2. have a Class 4 Oregon driver's license;

"3. have a driver's permit issued by the City;

All drivers of taxis, whether owners or shift lease operators, who operate under one of Broadway's licenses can use the taxi during a 12-hour shift for any lawful purpose, or not use it at all. Drivers are not required to accept fares and can charge any amount, up to the legal maximum set by the city. They are not required to use Broadway's dispatching service and are subject to few restrictions if they do.[3] They are not assigned to any particular zone and can accept fares in any part of the city. Broadway cannot terminate a shift lease driver's contract in the course of a 12-hour shift.

Although it carried workers' compensation coverage for its administrative staff, Broadway did not provide coverage for owner-operators or for shift lease drivers. In its final premium audit for 1988, SAIF assessed Broadway a premium for shift lease drivers, because it concluded that they are subject workers. ORS 656.027. Broadway contends that, because it did not contract to pay a remuneration to, and did

---

"4. have a business license issued by the City;

"5. be at least 25 years old;

"6. have three years driving experience;

"7. have less than three safety convictions in three years;

"8. have two years verifiable employment; and

"9. sign an Independent Contractor Lease-Purchase Contract (Lease Purchase Contract).

"As part of the Lease Purchase Contract, a potential shift lease driver must execute a $250 promissory note. As assured by the Lease Purchase Contract and this promissory note, the shift lease driver agrees to return any assigned lease cab in good working condition less normal wear and tear. The owner-operator must deliver a lease cab to the shift lease driver with a full fuel tank at the beginning of the shift. The shift lease driver must return the cab with a full fuel tank, clean, and in safe operating condition at the end of the shift.

"Major repairs necessitated during the shift lease driver's shift (and arising from an accident or the shift lease driver's negligence) results in the shift lease driver's forfeiture of the $250 promissory note. Repairs exceeding the $250 amount of the promissory note are the owner-operator's responsibility as are major repairs which arise from normal wear and tear or from accidents or negligence occurring off the shift lease driver's shift.

"The Lease Purchase Contract also requires that a shift lease driver, who is scheduled to drive but who cannot do so, notify [Broadway] at least four hours before their shift begins; otherwise the shift lease driver must pay [Broadway] the lease price for the 12-hour shift."

[3] If an operator requests and is assigned a fare, the operator must take that fare, unless another operator agrees to take it.

not secure the right to direct and control the services of, the shift lease drivers, it is not a subject employer.[4] We agree.

Every employer employing one or more subject workers must provide workers' compensation benefits. ORS 656.023. ORS 656.005(13) defines "employer" as "any person * * * who contracts to pay a remuneration for and secures the right to direct and control the services of any person." Whether an entity is an employer is a question of law. *Castle Homes, Inc. v. Whaite, supra* n 4, 95 Or App at 272; *Michelet v. Morgan*, 11 Or App 79, 83, 501 P2d 984 (1972). The determinative issue is whether Broadway exercised sufficient direction and control over the shift lease drivers to fall within that definition. To resolve that issue, we consider "(1) direct evidence of the right to, or the exercise of, control; (2) the method of payment; (3) the furnishing of equipment; and (4) the right to fire." *Castle Homes, Inc. v. Whaite, supra* n 4, 95 Or App at 272.

In *Henn v. SAIF*, 60 Or App 587, 591, 654 P2d 1129 (1982), *rev den* 294 Or 536 (1983), we applied those standards to determine that a magazine salesperson was not under the direction and control of the magazine distributor. We found it significant that the salesperson was not required to work fixed hours or report her daily receipts. Moreover, she could use her own sales techniques, provided that she not violate company policy or the law, and had discretion to choose where and whom she would solicit. The agreement that she signed with the distributor expressly provided that she was not an employee of the distributor. We also found it significant that she was paid on a commission basis, because that kind of remuneration structure "lessens an employer's interest in the details of how the employe spends her time." 60 Or App at 592. We did not consider it decisive that the distributor

---

[4] Before the Board, and in its petition for judicial review, Broadway argued that the shift-lease drivers are independent contractors. Because a "subject employer" is any entity that employs one or more subject workers, ORS 656.023, we look to see if that entity employs any "workers" to determine if it is a "subject employer." *See Castle Homes, Inc. v. Whaite*, 95 Or App 269, 271, 769 P2d 215 (1989). Independent contractors are not "workers." ORS 656.005(28); *Woody v. Waibel*, 276 Or 189, 195, 554 P2d 492 (1976). By arguing that the shift-lease drivers are independent contractors, Broadway necessarily argued that it is not a "subject employer." We need not decide whether the shift lease drivers are independent contractors.

provided training and guaranteed its salespersons a minimum salary if they worked a certain number of hours per month.

DIF concluded that Broadway exercised sufficient direction and control over the shift lease drivers by

"1.  setting the shift lease driver initial requirements;

"2.  reserving the right to approve any shift lease driver prior to the owner-operator signing a contract with a driver;

"3.  maintaining a list of available shift lease drivers and assigning them to cabs as cabs are available.

"4.  requiring a shift lease driver to contact [Broadway] at least four hours in advance if a driver is unable to drive their shift; and

"5.  retaining the right to terminate the lease agreement between an owner-operator and a shift lease driver."

Although those findings are relevant, they do not, when viewed in the light of the remaining uncontroverted evidence in the record, support a conclusion that Broadway is the employer of the shift lease drivers.

The uncontroverted evidence is that Broadway exercised no more control over the shift lease drivers than the magazine distributor in *Henn v. SAIF, supra,* exercised over its salesperson.[5] The drivers, like that salesperson, have absolute control over how much or how little they work and can conduct themselves in any manner that they see fit, provided that they do not violate general company policy or the law. The shift lease operators, like the salesperson, control their own rate of compensation by setting fares, choosing zones and deciding how many hours, out of a 12-hour shift, to operate the taxi. In *Henn,* the distributor provided its salespersons with leads, but a salesperson was not required to pursue them. Broadway provides dispatching services, but the shift lease drivers are not required to use them. In *Henn,*

---

[5] In *Castle Homes, Inc. v. Whaite, supra,* 95 Or App at 271, we said that

"where, as here, the facts are generally undisputed, the question of the nature of the employment relationship is one of law."

When reviewing questions of law, if "the evidence relevant to the findings is uncontroverted * * * we may consider the findings that should have been made." *Pruett v. Employment Division,* 86 Or App 516, 520, 740 P2d 196 (1987).

the distributor furnished magazines to be sold. Broadway, through the owner-operators, furnishes the taxis to the shift lease drivers. Like the salespersons, the shift lease drivers received training from the putative employers.

We cannot discern any substantive difference in the control exercised by the distributor in *Henn* and the control Broadway exercises over its shift lease drivers. Accordingly, DIF erred in concluding that Broadway is the employer of the shift lease drivers and that it is liable for their workers' compensation coverage.

Reversed and remanded.